UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR SHARRIEFF GAY, E22575,<br><br>Plaintiff,<br><br>v.<br><br>AMY PARSONS, et al.,<br><br>Defendant(s). | Case No. 16-cv-05998-CRB (PR)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND REFERRING CASE TO MAGISTRATE JUDGE FOR SETTLEMENT PROCEEDINGS**<br><br>(ECF No. 22) |

Plaintiff, a prisoner at the California Men's Colony (CMC) in San Luis Obispo, filed a sworn and verified pro se complaint under 42 U.S.C. § 1983 alleging that in September 2015, while he was incarcerated at the Correctional Training Facility (CTF) in Soledad, Board of Parole Hearings (BPH) psychologists Amy Parsons and Gregory S. Goldstein interviewed him for a psychological diagnostic evaluation in preparation for a subsequent parole suitability hearing and, on account of his being African-American and Muslim, assessed him as high risk for future violence in their report. Plaintiff claims this amounted to unlawful discrimination and retaliation.

Per order filed on June 28, 2017, the court found that plaintiff's allegations, liberally construed, appeared to state arguably cognizable claims under § 1983 for denial of equal protection and for retaliation against defendants Parsons and Goldstein, and ordered the United States Marshal to serve them. The court dismissed all other purported claims and defendants under the authority of 28 U.S.C. § 1915A(b).

Defendants now move for summary judgment on the ground that there are no material facts in dispute and that they are entitled to judgment as a matter of law. They also claim that they are entitled to qualified immunity. Plaintiff has filed an opposition and defendants have filed a reply.

## BACKGROUND

The September 2015 risk assessment report prepared by Defendant Goldstein and reviewed by Defendant Parsons before plaintiff's subsequent parole suitability hearing included a section entitled "Assessment of Risk for Violence." Compl. Ex. B (ECF No. 1-2) at 11. In that portion of the report, defendants wrote that "Mr. Gay presents with several factors in the historical domain which have been associated with future risk for violence." Id. They noted that plaintiff had a history of violent crime and other antisocial behavior that began at a young age, and increased in severity until he was convicted in 1989 of the attempted murder of a police officer. According to defendants, "Mr. Gay's history of violence and other antisocial behavior are highly relevant risk factors for future violence." Id. at 11-12. Plaintiff's antisocial behavior included the following:

Substance Abuse: The report notes that the records indicate that plaintiff's substance abuse history involved the use of alcohol, marijuana and PCP. Plaintiff also was engaged in the selling narcotics and "associated violence related to that lifestyle." Id. at 12. As a result, "Mr. Gay's history of substance use and his involvement in selling narcotics is a relevant factor in his risk for future violence." Id.

Negative Relationships and Violent Attitude: During his interview with defendants, plaintiff "noted that his father was involved in organized crime and acknowledged that his father extorted money from businesses in their area." Id. He also explained that his father "instilled early in him that he should not accept the police's authority, the government, or the rule of law." Id. At a young age, plaintiff sought out negative peers, became a gang member, pursued a criminal lifestyle and engaged in ongoing violence. Plaintiff also made a targeted attack on a police officer with the intent to commit murder. As a result, defendants concluded that plaintiff's "history of negative relationships and violent attitude, each present as highly significant factors in his risk for future violence." Id.

History of Employment Problems: The report also noted that plaintiff did not have a consistent work history as an adult in the community. Plaintiff "chose to forgo legitimate employment and instead engaged in gang warfare and criminal behavior for financial gain." Id. And during his incarceration, plaintiff's work history had not been especially strong. In 2013, plaintiff received "Counseling Chronos" for "failure to report to work and not performing his assigned task," and in 2012, he was written up by correctional staff who suspected he was faking an injury in order to avoid his work assignment. Id. According to defendants, plaintiff's "choice

to forgo legitimate employment for criminal behavior and his history of employment problems while in prison present as highly relevant risk factors for future violence." Id.

Defendants' report also recounted that plaintiff, who attributed his behavior as a young adult to his father's teachings, was now a devout Muslim, "and has accepted Islamic law as his moral compass, guiding his beliefs and actions." Id. at 14. But according to defendants, plaintiff did not "appear to have insight as to why he wholly embraced his father's value system, Islamic law, or any other system he chooses to embrace in the future." Id. They added that plaintiff's "total commitment to whatever cause he sees fit in the future, and his lack of insight as to why he totally commits himself to that cause as he did on the day he committed the life crime, is a highly significant factor in Mr. Gay's future risk for violence." Id.

In the final section of the report, defendants concluded that "based upon an analysis of the presence and relevance of empirically supported risk factors, case formulation of risk, and consideration of the inmate's anticipated risk management needs if granted parole supervision (i.e., intervention, monitoring), Mr. Gay represents a ***High*** risk for violence." Id. at 16 (emphasis in original). They noted that plaintiff had not programmed well during his incarceration and added the following observation:

> Overall, Mr. Gay has not spent a great deal of time while incarcerated attending self-help programming and his level of understanding of his antisocial personality characteristics which predispose him to violence is lacking. Furthermore, Mr. Gay's continued oppositional attitude toward authority does not appear to be well contained and continues to be a highly relevant factor in his risk for future violence at this time. Lastly, Mr. Gay has not communicated an understanding of his total commitment to a particular belief system such as that of his father, his Islamic faith, or any other system he may adopt in the future. And this lack of understanding makes his susceptibility to possible negative influences unpredictable.

Id.

/

/

## DISCUSSION

A. Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material

3

fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, [as is the case here,] the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). A triable dispute of material fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party. Anderson, 477 U.S. at 249. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 249. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Id. at 249-50.

B. Analysis

Defendants argue that they are entitled to summary judgment and qualified immunity on plaintiff's claims that defendants' assessment of plaintiff as high risk for future violence amounted to denial of equal protection and to retaliation. Under Saucier v. Katz, 533 U.S. 194 (2001), the court must undertake a two-step analysis when a defendant asserts qualified immunity in a motion for summary judgment. The court first faces "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity.

If the court determines that the conduct did violate a constitutional right, it then moves to the second step and asks "whether the right was clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02. Even if the violated right was clearly established, qualified immunity shields an officer from suit

4

when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he confronted. Brosseau v. Haugen, 543 U.S. 194, 198 (2004); Saucier, 533 U.S. at 205-06. If "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense." Id. at 205.[1]

1. Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)). "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." Wolff v. McDonnell, 418 U.S. 539, 556 (1974) (citation omitted). They also are protected under the Equal Protection Clause from invidious discrimination based on being an adherent of a minority religion. See Cruz v. Beto, 405 U.S. 319, 322 (1972).

To state a claim under § 1983 for violation of the Equal Protection Clause, a prisoner plaintiff must show that the defendants acted with an intent or purpose to discriminate against him based upon his membership in a protected class. Furnace v. Sullivan, 705 F.3d 1021, 1030 (9th Cir. 2013); Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003). "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status." Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994) (emphasis in original) (citation omitted). To avoid summary judgment, a prisoner plaintiff must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the decision at issue was motivated at least in part by his membership in a protected class. Serrano, 345 F.3d at 1082.

Defendants argue that the September 2015 risk assessment report shows that plaintiff's status as an African-American Muslim did not impact their decision that plaintiff posed a high risk for violence. They note that the report makes clear that they found plaintiff to be a high risk for violence because plaintiff has a history of violence and antisocial behavior, and continues to exhibit antisocial personality characteristics that predispose him to violence. Defendants did note in the report that plaintiff's father was a "'Black Nationalist' who considered himself a Muslim," Comp. Ex. B at 2, and that plaintiff reported that "he acted so violently because he devoted

---

[1] Although the Saucier sequence is often appropriate and beneficial, it is not mandatory. A court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

5

himself completely to the internalized belief system instilled in him by his father," id. at 14. But defendants' expressed concern was not with plaintiff's status as an African-American Muslim, but rather with the fact that plaintiff "has not communicated an understanding of his total commitment to a particular belief system such as that of his father, his Islamic faith, or any other system he may adopt in the future. And this lack of understanding makes his susceptibility to possible negative influences unpredictable." Id. at 16.

Under the facts presented in the September 2015 risk assessment report, no reasonable jury could find that defendants' decision that plaintiff posed a high risk for violence was motivated by plaintiff's status as an African-American Muslim. See Anderson, 477 U.S. at 249. But plaintiff's detailed description of the psychological diagnostic evaluation and process that led to defendants' decision is very different from that provided in the report.

In his sworn and verified complaint,[2] plaintiff alleges that during the psychological diagnostic evaluation with defendants he "explained in detail his earliest childhood benefits, introduction, and positive experiences and beliefs from his father's Black Nationalistic and Pseudo Islamic belief system." Compl. ¶ 16.

> Plaintiff actually elaborated to Defendants, when asked, how Plaintiff's father was a member of a pro-Black Nationalist organization having Pseudo-Islamic beliefs and practiced the social and economic upliftment [sic] of African Americans through 'Black free enterprise, the establishment of Black-owned, Black-operated businesses in the African American communities to the full exclusion of the Jewish business monopoly in the African American communities at that time in the nineteen fifties and nineteen sixties.

Id. ¶ 80. But defendants responded angrily to his description of his community members by referring to them as a "bunch of gorillas and thugs in suits and bow ties." Id. ¶ 81. And in their risk assessment report, they stated that plaintiff had "noted that his father was involved in organized crime, and acknowledged that his father extorted money from businesses in their area. Mr. Gay also explained that his father instilled early in him that he should not accept the police's

---

[2] A verified complaint may be treated as an opposing affidavit or declaration where, as here, plaintiff states under penalty of perjury that the allegations are true and correct, and the allegations are based on his personal knowledge. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995).

6

authority, the government, or the rule of law." Id. Ex. B at 2. Plaintiff refutes this by alleging that "at no time did Plaintiff report or acknowledge to said Defendants that Plaintiff's father 'was involved in organized crime and extortion.'" Id. ¶ 82. Defendants "prejudicially changed lawful economic 'free enterprise' by Black people into 'organized crime' and 'extortion' and 'Black Muslims' into being 'organized criminals.'" Id. ¶ 83.

Plaintiff further alleges that defendants asked him "racially charged anti-Islamic" questions and called him "racially charged anti-Islamic" names. Id. ¶ 17. At one point during the evaluation, Defendant Parsons looked directly at plaintiff and said, "'talk about radical Black Islamic terrorist.'" Id. ¶¶ 20, 21. At another point during the evaluation, Defendant Goldstein said, "'with everything going on in the world, at home with Moslems, we don't know if you are just another radical Islamic terrorist." Id. ¶ 14. Goldstein added, "'Parsons and I are just trying to understand in your own words a little about your history as a Moslem, who are you today? What particular ideology do you follow? Malcolm X? Luis Farrakhan? Osama Bin Laden? Who are you today?'" Id. ¶ 15. And when plaintiff noted that he had "self-esteem not conceit" in response to a question about whether he thought highly of himself, id. ¶ 23, Goldstein asked, "'is that the sort of teachings you learned from those criminals and Black Nationals growing up as a child?" id. ¶ 24. Plaintiff objected to the characterization of Black Nationalists as criminals, but Goldstein continued, "'I bet they taught you a lot of that militant garbage and nonsense like Black Power, Black Pride, smashing up Jewish liquor stores, huh?" Id. ¶ 27.

Viewing the evidence in the light most favorable to plaintiff as the nonmoving party, plaintiff has alleged sufficient facts to permit a reasonable trier of fact to find by a preponderance of the evidence that defendants' decision that he posed a high risk for violence was motivated at least in part by his status as an African-American Muslim. Although defendants point to various permissible findings and observations in support of their decision, the fact remains that plaintiff has alleged under penalty of perjury that defendants made specific, racially and anti-Islamic tinged remarks during the evaluation, and this is sufficient evidence of discriminatory intent to create a genuine issue of material fact as to whether defendants' actions violated the Equal Protection Clause. See Serrano, 345 F.3d at 1082-83 (prisoner's declaration that hearing officer made specific racial comments at disciplinary hearing in response to prisoner's own infusion of race into the hearing – specifically, hearing officer remarked that he "[didn't] know how black people think" and that "he was treating [prisoner] like all the rest . . . and that [prisoner] was 'not O.J.

Simpson or Johnnie Chocran'" – was enough to create a triable issue of fact on prisoner's § 1983 claim that decision not to allow live witness testimony at hearing was racially motivated).

Defendants are not entitled to summary judgment on plaintiff's equal protection claim. See id. at 1083. Nor are they entitled to qualified immunity at this stage in the proceedings. Whether defendants may be said to have made a "reasonable mistake" of fact or law entitling them to qualified immunity, Saucier v. Katz, 533 U.S. 194, 205 (2001), will depend on the resolution of disputed facts and the inferences that may be drawn therefrom. See Santos v. Gates, 287 F.3d 846, 855 n.12 (9th Cir. 2002).

2. Retaliation

To prevail on a First Amendment retaliation claim, a prisoner must show: (1) that a state actor took some adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the prisoner's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal. Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005). The prisoner must prove all the elements of a retaliation claim, including the absence of legitimate correctional goals for the conduct of which he complains. Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995). Plaintiff does not.

Plaintiff claims that defendants decided that he posed a high risk for violence in retaliation for his status as an African-American Muslim. But this is a reiteration of plaintiff's equal protection claim rather than a stand-alone First Amendment retaliation claim. To be sure, it is well established in this circuit that the right to equal protection includes the right not to be retaliated against because of the protected status of the person to whom one offers assistance with the filing of a grievance or complaint. See Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994) (noting that jury instructions correctly explained that right to equal protection of the laws includes right not to be subjected to retaliation because one offers assistance to a Black person). In order to prove such an equal protection violation, a plaintiff must show that the individual defendants retaliated against him at least in part because of the protected status of the person to whom plaintiff offered assistance with the filing of a grievance or complaint. See id. at 1404-05 (jury verdict for white plaintiff on equal protection claim under § 1983 reversed where there was no evidence that defendants retaliated against plaintiff because he assisted Black job applicant who was passed over for job). But plaintiff makes no such claim, let alone such showing. Nor does plaintiff set forth any evidence showing all the elements of a First Amendment retaliation claim. See Rhodes, 408 F.3d at 567-68; Pratt, 65 F.3d at 806.

Defendants are entitled to summary judgment and qualified immunity on plaintiff's retaliation claim. See Celotex Corp., 477 U.S. at 323; Saucier, 533 U.S. at 201.

/

/

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (ECF No. 22) is GRANTED IN PART and DENIED IN PART. Defendants are entitled to summary judgment and qualified immunity on plaintiff's retaliation claim, but are not entitled to summary judgment or qualified immunity on plaintiff's equal protection claim at this stage in the proceedings.

The court finds that referral of this case to a magistrate judge for settlement proceedings is in order and hereby REFERS this matter to Magistrate Judge Illman for settlement proceedings. All other proceedings are stayed.

A settlement conference shall take place within 90 days of the date of this order, or as soon thereafter as is convenient to Magistrate Judge Illman's calendar. Magistrate Judge Illman shall coordinate a time and date for the conference with all interested parties and/or their representatives and, within ten (10) days after the conclusion of the conference, file a report regarding the conference.

The clerk shall provide a copy of this order to Magistrate Judge Illman.

**IT IS SO ORDERED**.

Dated: May 4, 2018

_____
CHARLES R. BREYER
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR SHARRIEFF GAY,<br><br>    Plaintiff,<br><br>    v.<br><br>AMY PARSONS, et al.,<br><br>    Defendants. | Case No. 3:16-cv-05998-CRB<br><br>**CERTIFICATE OF SERVICE** |

    I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

    That on May 4, 2018, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Omar Sharrieff Gay ID: E-22575
California Mens' Colony - West II
San Luis Obispo, CA 93409

Dated: May 4, 2018

                                                Susan Y. Soong
                                                Clerk, United States District Court

                                                By: _____
                                                Lashanda Scott, Deputy Clerk to the
                                                Honorable CHARLES R. BREYER