1  XAVIER BECERRA
   Attorney General of California
2  JAY M. GOLDMAN
   Supervising Deputy Attorney General
3  MICHAEL J. QUINN
   Deputy Attorney General
4  State Bar No. 209542
    455 Golden Gate Avenue, Suite 11000
5    San Francisco, CA  94102-7004
    Telephone:  (415) 703-5726
6   Fax:  (415) 703-5843
    E-mail:  Michael.Quinn@doj.ca.gov
7  *Attorneys for Defendants Parsons and Goldstein*

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

12
   | | |
   |---|---|
   | **OMAR S. GAY,** | 16-cv-5998-CRB |
13 | | |
   | Plaintiff, | **DEFENDANTS' NOTICE OF MOTION** |
14 | | **AND MOTION FOR SUMMARY** |
   | | **JUDGMENT** |
   | v. | |
15 | | Date:        March 18, 2021 |
   | | Time:        10:00 a.m. |
16 | **AMY PARSONS,** | Ctrm:        6 |
   | | Judge:      The Honorable Charles R. |
17 | Defendant. | Breyer |
   | | Trial Date:  None Set |
18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3  Memorandum of Points and Authorities ................................................................................. 1

4  Introduction ............................................................................................................................. 1

   Statement of the Issue ............................................................................................................. 2

5  Statement of Facts ................................................................................................................... 3

6         A.      The Parties. ......................................................................................................... 3

7         B.      Plaintiff's Claims and the Order of Service. ...................................................... 3

          C.      The Board of Parole Hearings' Forensic Assessment Division and
8                 Comprehensive Risk Assessments. .................................................................... 3

9         D.      The Defendants' September 2015 Comprehensive Risk
                  Assessment. ......................................................................................................... 6

10  Procedural History .................................................................................................................. 8

11        A.      Defendants' Initial Motion for Summary Judgment. ......................................... 8

          B.      Defendants' Motion for Judgment on the Pleadings and the Ninth
12                Circuit's Decision. .............................................................................................. 9

13  Standard of Review ............................................................................................................... 10

    Argument .............................................................................................................................. 10

14        I.      Defendants Have Quasi-Judicial Immunity From Damages Liability for the
15                Alleged Acts Giving Rise to Plaintiff's Claim. ............................................... 10

                  A.      Because the Psychologists Use Their Discretionary Judgment in
16                        Preparing the Comprehensive Risk Assessments, Which Are an
                          Integral Part of the Parole Consideration Process, They Are Entitled
17                        to Quasi-Judicial Immunity. ................................................................. 11

18                B.      Defendants Relied Upon the Structured Risk Assessment
                          Instruments and Used Their Discretionary Judgment in Preparing
19                        the September 2015 Report. .................................................................. 12

          II.     This Court Should Follow the Third Circuit's Decision in Williams v.
20                Consovoy and Extend Quasi-Judicial Immunity to State Psychologists Who
                  Prepare Psychological Evaluations for a Parole Board. ................................... 13

21        III.    The Preparation of a Psychological Evaluation Is Not a Fact-Gathering
22                Process Similar to a Police Officer. ................................................................. 14

    Conclusion ............................................................................................................................ 16

23

24

25

26

27

28

# TABLE OF AUTHORITIES

<u>**Page**</u>

**CASES**

*Anderson v. Boyd*
    714 F.2d 906 (9th Cir. 1983).............................................................................2, 14

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986)....................................................................................10

*Antoine v. Byers & Anderson, Inc.*
    508 U.S. 429 (1993)................................................................................ *passim*

*Broam v. Bogan*
    320 F.3d 1023 (9th Cir. 2003).........................................................................15

*Burkes v. Callion*
    433 F.2d 318 (9th Cir. 1970)...........................................................................11

*Burns v. Reed*
    500 U.S. 478 (1991)....................................................................................11

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)....................................................................................10

*Imbler v. Pachtman*
    424 U.S. 409 (1976)....................................................................................11

*McArdle v. Tronetti*
    961 F.2d 1083 (3rd Cir. 1992) ........................................................................13

*Miller v. Gammie*
    335 F.3d 889 (9th Cir. 2003) (en banc).................................................................10

*Moore v. Brewster*
    96 F.3d 1240 (9th Cir. 1996)......................................................................1, 11

*Morstad v. Dep't of Corr. & Rehab.*
    147 F.3d 741 (8th Cir. 1998)..........................................................................13

*Rawlins v. Olson*
    1994 WL 143067 (9th Cir. 1994).......................................................................15

*Rosser v. Shaffer*
    2017 WL 1064670 (E.D. Cal. March 20, 2017)........................................................15, 16

1

2

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Ruffin v. Cty. of Los Angeles*
    607 F.2d 1276 (9th Cir. 1979) ................................................................. 10

*Sellars v. Procunier*
    641 F.2d 1295 (9th Cir. 1981) ................................................. 13, 14, 16

*Steckl v. Motorola, Inc.*
    703 F.2d 392 (9th Cir. 1983) .................................................................. 10

*Swift v. California*
    384 F.3d 1184 (9th Cir. 2004) ............................................... *passim*

*Williams v. Consovoy*
    453 F.3d 173 (3d Cir. 2006) ................................................... 13, 14

**STATUTES**

California Code of Regulations, Title 15
    § 2240 .................................................................................................... 11

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Eighth Amendment ............................................................................... 13

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 56 ..................................................................................................... 1
    Rule 56(a) .............................................................................................. 10

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **TO PLAINTIFF OMAR S. GAY AND HIS ATTORNEYS OF RECORD:**

2        **PLEASE TAKE NOTICE** that on March 18, 2021 at 10:00 a.m., or as soon thereafter as

3    the matter may be heard in the above-entitled court, at 450 Golden Gate Avenue in San Francisco,

4    Defendants Parsons and Goldstein move this Court, under Federal Rules of Civil Procedure, Rule

5    56, for summary judgment on the grounds that Defendants have quasi-judicial immunity from

6    damages liability for the alleged acts giving rise to Plaintiff's claim.

7        This motion is based upon this notice of motion and motion, the memorandum of points and

8    authorities, the declarations of Jennifer Shaffer and Gregory Goldstein, this Court's file, and any

9    matters properly before this Court.

10                    **MEMORANDUM OF POINTS AND AUTHORITIES**

11                                      **INTRODUCTION**

12        In this case, Plaintiff Gay, an inmate previously housed at the Correctional Training

13   Facility, alleges that Board of Parole psychologists Parsons and Goldstein violated his equal

14   protection rights.  Specifically, Gay asserts in conclusory allegations that Defendants assessed

15   him as a high risk for future violence in their risk determination report before his October 2015

16   parole suitability hearing on account of his being African-American and Muslim.  But the report

17   itself, which is attached to the complaint, lacks any statements specifying that Gay was assessed

18   based on his race or religion.

19        The U.S. Supreme Court has recognized that "[w]hen judicial immunity is extended to

20   officials other than judges, it is because their judgments are 'functional[ly] comparab[le]' to those

21   of judges—that is, because they, too, 'exercise a discretionary judgment' as part of their

22   function." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993).  Moreover, the Ninth

23   Circuit extends immunity to those "who perform functions closely associated with the judicial

24   process." *Moore v. Brewster*, 96 F.3d 1240, 1244-45 (9th Cir. 1996) (extending absolute

25   immunity to law clerk).  Court-appointed psychologists and parole-board officials receive quasi-

26   judicial immunity for performing functions integral to the judicial process.  Here, because

27   psychologists Goldstein and Parsons were serving the Board of Parole Hearings in a virtually

28   identical function, they are entitled to quasi-judicial immunity from damages liability.

                                                1

1   Specifically, the evaluation here—a comprehensive Board of Parole Hearings psychological risk-

2   assessment concerning Plaintiff Omar Gay's high risk for future violence—is a discretionary

3   evaluation that is integral to the parole-consideration process.

4        The decisions in *Swift v. California*, 384 F.3d 1184 (9th Cir. 2004) and *Anderson v. Boyd*,

5   714 F.2d 906 (9th Cir. 1983), which this Court previously relied on in denying Defendants'

6   motion for judgment on the pleadings in connection with the quasi-judicial immunity issue, are

7   distinguishable.  Both cases concerned parole officers who acted outside the sphere of the parole

8   board when they circulated false statements concerning the parolee's criminal record, investigated

9   parole violations, and recommended the initiation of parole-revocation proceedings.  Unlike these

10  officers, Parsons and Goldstein did not function as law enforcement officers or perform

11  investigatory functions.  To the contrary, they exercised discretionary judgment to prepare a

12  comprehensive psychological risk-assessment report at the request of the parole board.

13       Preparing a psychological evaluation at the direction of the parole board is an integral part

14  of the process for assessing whether an inmate should be paroled.  Gay could not sue the parole

15  board members for denying him parole, and he also cannot sue the psychologists for preparing an

16  evaluation for the board.  Therefore, as explained more fully below, Defendants Parsons and

17  Goldstein have quasi-judicial immunity from damages in connection with the report that they

18  prepared before Gay's parole suitability hearing.

19                        **STATEMENT OF THE ISSUE**

20       Judicial immunity is extended to officials other than judges when their judgments are

21  functionally comparable to those of judges, as they also exercise a discretionary judgment as part

22  of their function.  Like a court-appointed psychologist's submission of psychological reports to

23  the court, the assessment of Plaintiff by Defendants Parsons and Goldstein was prepared for the

24  Board of Parole Hearing's benefit, involved Defendants' discretionary judgment, and, had Gay

25  not stipulated through his counsel to his unsuitability for parole, would have been integral to the

26  parole-consideration process.  Are Defendants entitled to quasi-judicial immunity from damages

27  liability for the alleged acts giving rise to Plaintiff's claim?

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT OF FACTS**

**A.    The Parties.**

Plaintiff Omar S. Gay is currently an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR).  Defendant Goldstein is a Forensic Psychologist for the Board of Parole Hearings (Board), while Defendant Parsons is a Senior Psychologist for the Board.  (ECF No. 1-2, p.18.)

**B.    Plaintiff's Claims and the Order of Service.**

Plaintiff alleges that in September 2015, while he was incarcerated at the Correctional Training Facility, Defendants Parsons and Goldstein interviewed him for a psychological diagnostic evaluation in preparation for a parole suitability hearing.  (ECF No. 16, 1:17-22.) According to Plaintiff, Defendants concluded that he was a high risk for future violence because he is African-American and Muslim, and previously refused psychological diagnostic evaluations.  (*Id*. at 1:22-25.)

In a June 28, 2017 Order of Service, this Court concluded that "[l]iberally construed, plaintiff's allegations that psychologists Parsons and Goldstein assessed [Plaintiff] as [a] high risk for future violence on account of his being African-American and Muslim state an arguably cognizable § 1983 claim for denial of equal protection against these two defendants."  (*Id*. at 2:20-23.)  In addition, the Court stated that Plaintiff's allegations stated an arguably cognizable § 1983 claim for retaliation against the two defendants "because the right to equal protection includes the right not to be retaliated against because of one's protected status."  (*Id*. at 2:26-3:3.)

**C.    The Board of Parole Hearings' Forensic Assessment Division and Comprehensive Risk Assessments.**

In 2009, the Board of Parole Hearings ("Board") was ordered to develop a streamlined and standardized psychological risk assessment process.  (Shaffer Declaration, ¶6.)  The Board eventually developed a proposal to implement standardized risk assessments, consulted with experts on best practices and the selection of risk assessments, and the Forensic Assessment Division (FAD) was created.  (*Id*.)

3

1   The comprehensive risk assessments (CRA) prepared by FAD psychologists, such as the

2   September 2015 report regarding Plaintiff, are tools hearing panels use during parole

3   consideration hearings.  (*Id*. at ¶7.)  The CRA does not substitute for the panel's determination of

4   an inmate's current risk of dangerousness if released to the community, but provides important

5   information and expert analysis.  (*Id*.)  The CRA is similar to a report from an expert witness who

6   provides a clinician's opinion, based on available data and the clinician's education and

7   experience.  (*Id*.)  The CRA also contains circumstances about the crime, and the person's prior

8   history and record, which may be considered either in aggravation or mitigation of their risk upon

9   release.  (*Id*.)  The FAD psychologists analyze facts, thought patterns, and behavior, and then use

10   their training, education, and standardized tools to opine regarding the inmate's potential risk if

11   released.  (*Id*.)  The CRA is the psychologist's report of that assessment of risk, which is part of

12   the information the hearing panel considers when determining whether or not to grant parole.

13   (*Id*.)

14   In preparing a CRA, the FAD psychologist initially reviews the inmate's file.  (*Id*. at ¶8.)

15   The psychologist will note static information about the commitment offense and criminal history.

16   (*Id*.)  The psychologist will also consider dynamic factors, including the inmate's disciplinary

17   record, medical history, current assignments, and participation in rehabilitative, vocational, and

18   educational programming.  (*Id*.)

19   The FAD psychologist then conducts an extensive interview with the inmate.  (*Id*. at ¶9.)

20   The interview covers static and dynamic facts, but the clinician also looks into what impact

21   certain historical events have had on the inmate.  (*Id*.)  Clinicians focus on the inmate's current

22   interpretation of the inmate's life crime, and ask questions regarding underlying motivation and

23   factors in commission of the crime.  (*Id*.)  At the interview, the psychologist delves into a broad

24   range of topics, including the inmate's programming efforts, disciplinary infractions, possible

25   parole plans and community support.  (*Id*.)  The clinician also incorporates structured risk

26   assessment instruments whenever appropriate, including the HCR 20-V3 (Historical Clinical Risk

27   Management -20), Psychopathy Checklist – revised (PCL-R), and STATIC-99R, which are

28   commonly used instruments by mental health professionals who assess risk of violence of

4

1  incarcerated individuals.  (*Id*.)

2          The HCR-20 was developed to help structure decisions about violence risk (based on static

3  and dynamic risk factors) and it has become the most widely used and best validated violence risk

4  assessment instrument in the world.  (*Id*. at ¶10.)  It has been translated into 20 languages and

5  adopted or evaluated in more than 35 countries.  (*Id*.)  The PCL-R, although not a risk assessment

6  instrument per se, is the most researched and most widely administered assessment of dissocial or

7  psychopathic personality characteristics associated with violent and sexual offending.  (*Id*.)  The

8  Static-99R is the State Approved Risk Assessment Tool for Sex Offenders (SARATSO) in

9  California.  (*Id*.)  The Static-99R is administered to provide a baseline estimate of risk for violent

10  and sexual reconviction among offenders who have committed sex crimes.  (*Id*.)  It is the most

11  researched and most widely administered assessment of sexual offending risk.  (*Id*.)  All three

12  instruments were developed to have widespread applicability in correctional and forensic settings,

13  have been cross-validated across many types of offender samples, and have been in use for more

14  than 25 years.  (*Id*.)

15          Through the file review, interview, and risk assessments, the FAD psychologist provides

16  empirically based conclusions from relevant sources of information.  (*Id*. at ¶11.)  The inmate's

17  mental health is assessed, and risk factors that have led to violent and antisocial behavior by the

18  inmate are identified, including substance abuse and criminal thinking.  (*Id*.)  The psychologist

19  also examines whether the risk factors have been addressed by the inmate, or whether risk factors

20  are still present and have not been addressed, making the inmate a higher risk upon release.  (*Id*.)

21          Psychologists exercise a discretionary judgment, based on the above-described information

22  and factors, in assessing whether the inmate's release would pose a low, moderate, or high risk of

23  danger to society.  (*Id*. at ¶12.)  In administering the HCR-20, there is not a numerical risk score

24  or algorithm for determining risk.  (*Id*.)  Rather, based on the assessment of static and dynamic

25  risk factors, the importance they may or may not possess for the given individual, and the degree

26  of intervention estimated to be necessary to prevent violence, clinicians are encouraged to arrive

27  at the appropriate risk level.  (*Id*.)

28

Defendants' Notice of Motion and Motion for Summary Judgment (16-cv-5998-CRB)

1    The Board uses the CRA as an important piece of expert evidence at the parole

2    consideration hearing.  (*Id*. at ¶15.)  Having the inmate's risk factors identified and an assessment

3    of whether or not they were addressed, in the clinical opinion of a forensic psychologist, can be

4    invaluable information.  (*Id*.)  The Board works diligently to base its discretionary decisions on

5    combinations of factors theoretically or empirically linked to violence, its persistence and

6    desistance, rather than "gut feelings."  (*Id*.)

7    The FAD psychologists are an important arm of the Board, and help the panels carry out

8    their adjudicative function.  (*Id*. at ¶16.)  The CRA risk ratings are a significant component

9    considered by hearing panels, and the risk factors identified by FAD psychologists focus the

10   hearing's discussion on issues relevant to current dangerousness rather than a recitation of

11   historical factors.  (*Id*.)  The CRAs and the psychologists' findings are frequently adopted and

12   cited by parole hearing panels in their parole decisions.  (*Id*.)

13   **D.     The Defendants' September 2015 Comprehensive Risk Assessment.**

14   The September 2015 risk assessment prepared by Defendant Goldstein and reviewed by

15   Defendant Parsons before Plaintiff's parole suitability hearing included a section entitled

16   "Assessment of Risk for Violence."  (ECF No. 1-2, p. 12 of 19.)  In that portion of the report,

17   Defendants wrote that "Mr. Gay presents with several factors in the historical domain which have

18   been associated with future risk for violence."  (*Id*.)  They noted that Gay had a history of violent

19   crime and other antisocial behavior that began at a young age and increased in severity until he

20   was convicted in 1989 of the attempted murder of a police officer.  (*Id*.)  According to

21   Defendants, "Mr. Gay's history of violence and other antisocial behavior are highly relevant risk

22   factors for future violence."  (*Id*. at pp.12 & 13 of 19.)  Gay's antisocial behavior included the

23   following:

24   - • Substance Abuse:  The records indicate that Gay's substance abuse history involved

25         the use of alcohol, marijuana, and PCP.  (*Id*. at p. 13 of 19.)  Gay was also engaged

26         in the selling narcotics and "associated violence related to that lifestyle."  (*Id*.)  As a

27         result, "Mr. Gay's history of substance use and his involvement in selling narcotics

28         is a relevant factor in his risk for future violence."  (*Id*.)

6

- Negative Relationships and Violent Attitude:  During his interview with Defendants, Mr. Gay stated that his father was involved in organized crime, and acknowledged that his father extorted money from businesses in the area.  (*Id.*)  He also explained that his father "instilled early in him that he should not accept the police's authority, the government, or the rule of law."  (*Id.*)  At a young age, Gay sought out negative peers, became a gang member, pursued a criminal lifestyle, and engaged in ongoing violence.  (*Id.*)  Furthermore, Gay made a targeted attack on a police officer with the intent to commit murder.  (*Id.*)  Defendants concluded that as a result, Gay's "history of negative relationships and violent attitude, each present as highly significant factors in his risk for future violence."  (*Id.*)

- History of Employment Problems: The report further noted that Gay did not have a consistent work history as an adult in the community.  (*Id.*)  Gay "chose to forgo legitimate employment and instead engaged in gang warfare and criminal behavior for financial gain."  (*Id.*)  Moreover, during his incarceration, Gay's work history had not been especially strong.  In 2013, he received a "counseling chrono" for failing to report to work and not performing his assigned task.  (*Id.*)  In addition, in 2012, Gay was written up by correctional staff who suspected he was faking an injury in order to avoid his work assignment.  (*Id.*)  According to Defendants, Gay's "choice to forgo legitimate employment for criminal behavior and his history of employment problems while in prison present as highly relevant risk factors for future violence."  (*Id.*)

Defendants' report also recounted that Gay, who attributed his behavior as a young adult to his father's teachings, was now a devout Muslim, "and has accepted Islamic law as his moral compass, guiding his beliefs and actions."  (*Id.* at p. 15 of 19.)  However, Defendants observed that Gay did not "appear to have insight as to why he wholly embraced his father's value system, Islamic law, or any other system he chooses to embrace in the future."  (*Id.*)  They added that "his total commitment to whatever cause he sees fit in the future, and his lack of insight as to why he totally commits himself to that cause as he did on the day he committed the life crime, is a highly

7

1  significant factor in Mr. Gay's future risk for violence." (*Id.*)

2        In the final section of the report, Defendants wrote that "based upon an analysis of the

3  presence and relevance of empirically supported risk factors, case formulation of risk, and

4  consideration of the inmate's anticipated risk management needs if granted parole supervision

5  (i.e., intervention, monitoring), Mr. Gay represents a **_High_** risk for violence." (emphasis in

6  original.) (*Id.* at p. 17 of 19.)  They observed that he had "not programmed well during his

7  incarceration," as evidenced by numerous rules violation reports and counseling chronos, and

8  added the following:

9        Overall, Mr. Gay has not spent a great deal of time while incarcerated attending self-
help programming and his level of understanding of his antisocial personality
10       characteristics which predispose him to violence is lacking.  Furthermore, Mr. Gay's
continued oppositional attitude toward authority does not appear to be well contained
11       and continues to be a highly relevant factor in his risk for future violence at this time.
Lastly, Mr. Gay has not communicated an understanding of his total commitment to a
12       particular belief system such as that of his father, his Islamic faith, or any other
system he may adopt in the future.  And this lack of understanding makes his
13       susceptibility to possible negative influences unpredictable.

14  (*Id.*)

15       Following the issuance of the report, inmate Gay voluntarily stipulated to parole

16  unsuitability at his October 7, 2015 parole hearing.  (ECF No. 55-1, Ex. A.)  At that hearing, Gay

17  was represented by counsel.  (*Id.*)  During that brief hearing, the Board of Parole's hearing panel

18  did not mention any concerns regarding the factual accuracy of statements in the report.  (*Id.*)

19  Nor, at Gay's parole hearing, did Gay's counsel.  (*Id.*)

20       On October 31, 2018, Gay was again considered for parole.

21  https://inmatelocator.cdcr.ca.gov/Details.aspx?ID=E22575.  The Board denied parole.  (*Id.*)

22  Gay's next tentative parole hearing is scheduled for October of this year.  (*Id.*)

23                          **PROCEDURAL HISTORY**

24  **A.    Defendants' Initial Motion for Summary Judgment.**

25       Defendants filed a motion for summary judgment on September 26, 2017.  In it, Defendants

26  argued that there were no facts in support of Gay's contention that Defendants violated his equal

27  protection rights, and that there was no triable issue in connection with Gay's retaliation claim, as

28  Defendants' report did not deprive him of his constitutional rights.  (ECF No. 22.)

8

1      In a May 14, 2018 Order, the Court concluded that Defendants were not entitled to

2   summary judgment on Plaintiff's equal protection claim, and that they were not entitled to

3   qualified immunity "at this stage of the proceedings." (ECF No. 28, 9:7-8.)  However, the Court

4   found that Defendants were entitled to summary judgment and qualified immunity on the

5   retaliation claim. (*Id*. at 8:8-9:2.)

6

7      **B.**    **Defendants' Motion for Judgment on the Pleadings and the Ninth Circuit's Decision.**

8      On April 25, 2019, Defendants filed a motion for judgment on the pleadings that argued

9   that they were entitled to quasi-judicial immunity from damages liability. (ECF No. 55.)

10      The district court denied the motion, relying heavily on *Swift v. California*, 384 F.3d 1184

11   (9th Cir. 2004).  In *Swift*, this Court noted that parole officers who submit investigative reports to

12   the parole board in support of a request for a parole revocation hearing, but do not participate in

13   the hearing, "are not absolutely immune from suits arising from conduct distinct from the

14   decision to grant, deny, or revoke parole." *Id*. at 1186-87.

15      The district court found that psychologists Parsons and Goldstein were similarly situated to

16   the parole officers who had gathered evidence in *Swift* because they were not engaged in the

17   parole board's decision-making process, and did not exercise discretion functionally comparable

18   to a judge. (ECF No. 64, 8:4-9:3.)  Therefore, the court denied the motion and held that Parsons

19   and Goldstein had not shown that they were entitled to quasi-judicial immunity. (*Id.*)

20      On August 23, 2019, Defendants filed a notice of appeal. (ECF No. 70.)  In a June 22,

21   2020 memorandum decision, the Ninth Circuit affirmed the district court's decision. (ECF No.

22   74.)  The decision noted that the district court properly found absolute immunity unavailable to

23   the psychologists at the pleading stage because "Gay had alleged that they 'did not participate in

24   the parole hearing—the most judge-like component of the parole process . . . but rather a fact-

25   gathering process similar to that of a police officer.'" (*Id*.)  In affirming, the Ninth Circuit

26   "intimate[d] no view on [the psychologists'] entitlement to immunity, should the evidence show

27   the facts to be other than as pleaded." *Id*. (quoting *Swift*, 384 F.3d at 1193 n.7).

28

1

## STANDARD OF REVIEW

2       Summary judgment is appropriate where "there is no genuine dispute as to any material fact

3   and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts

4   are those that may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

5   248 (1986).  The party moving for summary judgment bears the initial burden of identifying those

6   portions of the pleadings, discovery, and affidavits demonstrating the absence of a genuine issue

7   of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

8       Once the moving party meets its initial burden, summary judgment is mandated where the

9   nonmoving party fails to "set forth specific facts showing that there remains a genuine issue for

10  trial" and evidence "significantly probative as to any [material] fact claimed to be disputed."

11  *Steckl v. Motorola*, *Inc*., 703 F.2d 392, 393 (9th Cir. 1983), citing *Ruffin v. Cty. of Los Angeles*,

12  607 F.2d 1276, 1280 (9th Cir. 1979).  If the evidence presented by the nonmoving party is

13  "merely colorable, or is not sufficiently probative, summary judgment may be granted."

14  *Anderson*, 477 U.S. at 249-50.  There is no triable issue of fact unless the nonmoving party

15  submits sufficient evidence for a jury to return a verdict in the nonmoving party's favor.  *Id.*

16  

## ARGUMENT

17  **I.**   **DEFENDANTS HAVE QUASI-JUDICIAL IMMUNITY FROM DAMAGES LIABILITY FOR
       THE ALLEGED ACTS GIVING RISE TO PLAINTIFF'S CLAIM.**

18  

19      Non-judicial "officials performing the duties of advocate or judge may enjoy quasi-judicial

20  immunity for some functions."  *Swift v. California*, 384 F.3d 1184, 1188 (9th Cir. 2004).  But not

21  all "actions taken with court approval or under a court's direction are . . . in and of themselves

22  entitled to quasi-judicial, absolute immunity."  *Miller v. Gammie*, 335 F.3d 889, 897 (9th Cir.

23  2003) (en banc).  Instead, under the "functional approach" adopted by the Supreme Court in

24  *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 437 (1993), the "relevant test now is whether

25  the official is 'performing a duty functionally comparable to one for which officials were

26  rendered immune at common law.'"  *Swift*, 384 F.3d at 1190 (quoting *Miller*, 335 F.3d at 897).

27  The *Antoine* court recognized that "[w]hen judicial immunity is extended to officials other than

28  judges, it is because their judgments are 'functional[ly] comparab[le]' to those of judges—that is,

10

1   because they, too, 'exercise a discretionary judgment' as part of their function." *Antoine*, 508

2   U.S. at 436, quoting *Imbler v. Pachtman*, 424 U.S. 409, 423 n. 20 (1976).  "The proponent of a

3   claim to absolute immunity bears the burden of establishing the justification for such immunity."

4   *Antoine*, 508 U.S. at 432.  "The presumption is that qualified rather than absolute immunity is

5   sufficient. . . ." *Burns v. Reed*, 500 U.S. 478, 486 (1991).

6        The Ninth Circuit has recognized that court-appointed psychologists have quasi-judicial

7   immunity from liability for acts committed "in the performance of an integral part of the judicial

8   process," such as preparing and submitting medical reports.  *Burkes v. Callion*, 433 F.2d 318, 319

9   (9th Cir. 1970).  And it has extended such immunity to those "who perform functions closely

10  associated with the judicial process." *Moore v. Brewster*, 96 F.3d 1240, 1244-45 (9th Cir. 1996)

11  (extending absolute immunity to law clerk).

12       California requires the Board of Parole Hearings to perform a comprehensive,

13  psychological risk-assessment of life-term inmates to assist with evaluating suitability for parole.

14  The CRA is authorized by law as part of an official parole proceeding, and the state psychologists

15  prepare the Report as part of their duties under title 15, section 2240 of the California Code of

16  Regulations.  As explained more fully below, because FAD psychologists exercise a discretionary

17  judgment in preparing CRAs, and act as an arm of the Board, they are entitled to quasi-judicial

18  immunity from §1983 claims.

19      **A.   Because the Psychologists Use Their Discretionary Judgment in Preparing**
        **the Comprehensive Risk Assessments, Which Are an Integral Part of the**
20      **Parole Consideration Process, They Are Entitled to Quasi-Judicial**
        **Immunity.**
21

22       As mentioned, the CRA is similar to a report from an expert witness who provides a

23  clinician's opinion, based on available data and the clinician's education and experience.  (Shaffer

24  Declaration, ¶7.)  It does not involve merely collecting facts.  (*Id*.)  The psychologists analyze

25  facts, thought patterns, and behavior, and then use their training, education, and standardized

26  tools to assess the potential risk if the inmate is released from prison.  (*Id*.)  The CRA is the

27  psychologist's report of that assessment of risk, and is considered by the hearing panel when

28  determining whether or not to grant parole.  (*Id*.)

1    In preparing a CRA, the psychologist initially reviews the inmate's file and then conducts

2    an extensive interview with the inmate.  (*Id*. at ¶¶8-9.)  The interview addresses a broad range of

3    topics, including the inmate's programming efforts, disciplinary infractions, possible parole plans

4    and community support.  (*Id*. at ¶9.)  The psychologist also incorporates structured risk

5    assessment instruments whenever appropriate, including the HCR 20-V3 (Historical Clinical Risk

6    Management -20), which has become the most widely used and best validated violence risk

7    assessment instrument in the world.  (*Id*. at ¶¶9-10.)  Through the file review, interview, and risk

8    assessments, the FAD psychologist provides empirically based conclusions from relevant sources

9    of information.  (*Id*. at ¶11.)  The inmate's mental health is assessed, and risk factors that have led

10   to violent and antisocial behavior by the inmate are identified, including substance abuse and

11   criminal thinking.  (*Id*.).  Psychologists exercise a discretionary judgment, based on the above-

12   described information and factors, in assessing whether the inmate's release would pose a low,

13   moderate, or high risk of danger to society.  (*Id*. at ¶12.)

14   The expert observations and conclusions in the CRA are an important factor at a parole

15   consideration hearing.  (*Id*. at ¶15.)  Moreover, the risk ratings are a significant component

16   considered by hearing panels, and the risk factors identified by FAD psychologists focus the

17   hearing's discussion on issues relevant to current dangerousness.  (*Id*. at ¶16.)  The CRAs and the

18   psychologists' findings are frequently adopted and cited by parole hearing panels in their parole

19   decisions.  (*Id*.)

20   **B.    Defendants Relied Upon the Structured Risk Assessment Instruments and
21           Used Their Discretionary Judgment in Preparing the September 2015
             Report.**

22   In this case, Defendants Parsons and Goldstein exercised their discretionary judgment in

23   preparing the September 2015 risk-assessment report regarding Plaintiff.  Specifically, Defendant

24   Goldstein, who wrote the report, used his education, experience, training, and the risk assessment

25   instruments in preparing it.  (Goldstein Declaration, ¶5.)  In fact, the report specifically mentions

26   the HCR-20-V3 in the section concerning Gay's risk for violence.  (*Id*.)  Goldstein also used his

27   judgment in determining that inmate Gay was a high risk for violence.  (*Id*. at ¶4.)  Given that the

28   report involved the use of Defendants' discretionary judgment and was integrally related to the

12

1  decision to grant or revoke parole, Parsons and Goldstein are entitled to absolute immunity from

2  § 1983 claims.

3  **II.   THIS COURT SHOULD FOLLOW THE THIRD CIRCUIT'S DECISION IN *WILLIAMS V. CONSOVOY* AND EXTEND QUASI-JUDICIAL IMMUNITY TO STATE PSYCHOLOGISTS WHO PREPARE PSYCHOLOGICAL EVALUATIONS FOR A PAROLE BOARD.**

4

5        In *Williams v. Consovoy*, 453 F.3d 173, 178–79 (3d Cir. 2006), the Third Circuit recognized

6  that state psychologists enjoy quasi-judicial immunity because, in preparing a report at the parole

7  board's request to assist the board in its parole eligibility decision-making, psychologists act as

8  "an arm of the court" and assist the board's adjudicative function.  There, an inmate alleged that a

9  licensed psychologist had reported false and misleading information intended to cause the New

10 Jersey Parole Board to deny the inmate parole, which resulted in the inmate's false imprisonment

11 and was deliberately indifferent to his Eighth Amendment rights.  *Id*. at 176.  The Third Circuit

12 affirmed the district court's decision, which concluded that because the Parole Board had ordered

13 the psychologist to perform an evaluation to assist the Parole Board in making its parole

14 determination, he had engaged in "adjudicative conduct" and was therefore entitled to absolute

15 immunity.  *Id*. at 176, 178-79.

16       In its decision, the Third Circuit observed that the psychologist had performed a function

17 integral to the judicial process and was therefore situated similarly to the mental health

18 professionals in cases like *McArdle v. Tronetti*, 961 F.2d 1083, 1085 (3rd Cir. 1992) and *Morstad*

19 *v. Dep't of Corr. & Rehab.*, 147 F.3d 741, 744 (8th Cir. 1998) to whom absolute immunity from §

20 1983 claims attached.  *Id*. at 178.  Like those individuals, the psychologist had performed an

21 evaluation and presented his findings to the adjudicative Parole Board, which then relied on his

22 report and expertise in reaching its ultimate decision to deny the inmate's parole.  *Id*.  According

23 to the Third Circuit, "the only way to ensure unvarnished, objective evaluations from court-

24 appointed professionals [was] to afford them absolute immunity from suit for performing

25 evaluations, regardless of whether those evaluations [were] ultimately found dispositive by the

26 entity that requested them or [were] ultimately found lacking."  *Id*. at 178-79.

27       If state psychologists had to anticipate federal litigation every time their reports concluded

28 that a prisoner's rehabilitation was uncertain or otherwise provided an assessment that might

13

1   caution against parole, the objectivity of such reports would be compromised.  *See Sellars v.*

2   *Procunier*, 641 F.2d 1295, 1303 (9th Cir. 1981) (explaining that the threat of federal litigation

3   would render parole board officials' task of balancing the risks of release against the public's

4   right to safety "almost impossible").  In short, as with the psychologist in *Williams,* quasi-judicial

5   immunity applies here because state psychologists Goldstein and Parsons were acting at the

6   Board of Parole Hearings' request to assist in its adjudicative function of evaluating Gay's

7   eligibility for parole.

8   **III.   THE PREPARATION OF A PSYCHOLOGICAL EVALUATION IS NOT A FACT-**

9   **GATHERING PROCESS SIMILAR TO A POLICE OFFICER.**

10      In its July 2019 order denying Defendants' motion for judgment on the pleadings, this

11   Court relied on the *Swift* decision in concluding that Defendants were not entitled to quasi-

12   judicial immunity.  Specifically, the Court stated that Defendants were similarly situated to the

13   parole officers who had gathered evidence in *Swift* because they were not engaged in the parole

14   board's decision-making process, and did not exercise discretion functionally comparable to a

15   judge.  (ECF No. 64, 8:4-9:3.)  However, because a psychological assessment is not a fact-

16   gathering process similar to that conducted by law enforcement, neither *Swift v. California*, 384

17   F.3d 1184 (9th Cir. 2004) nor *Anderson v. Boyd*, 714 F.2d 906 (9th Cir. 1983) control the analysis

18   here.  Neither case involves risk-assessment reports submitted for consideration as part of the

19   parole decision.  Rather, these cases concerned officers who acted "outside of the immediate

20   sphere of the parole board."  *Anderson*, 714 F. 3d at 910.

21      In *Anderson*, the defendant parole officers were accused of knowingly circulating false

22   statements concerning a parolee's criminal record to police agencies, state parole officials, and

23   the racing commissioner in the community where he lived, and to the Governor of Oregon (who

24   was considering the parolee's request for commutation).  *Id*. at 909.  The Ninth Circuit rejected

25   the officers' contention that they were entitled to absolute immunity because, regardless of the

26   legitimacy of their conduct, the challenged actions did not relate to duties concerning a decision

27   to grant, deny, or revoke parole.  *Id*. at 910, *see also Sellars v. Procunier*, 641 F.2d 1295, 1303

28   (9th Cir. 1981).

14

1    Similarly, in *Swift*, this Court held that parole agents were not entitled to absolute immunity

2    for their conduct while performing law-enforcement functions, such as: (1) investigating parole

3    violations; (2) ordering the issuance of a parole hold and orchestrating the plaintiff's arrest; or (3)

4    recommending the initiation of parole revocation proceedings.  *Swift*, 384 F.3d at 1191.  The

5    Ninth Circuit explained that ordering the issuance of a parole hold and arrest independently from

6    the parole board's decision-making authority is a law-enforcement function.  *Id*. at 1192.  And,

7    like prosecutors, parole officers are not entitled to quasi-judicial immunity when "performing

8    investigatory or administrative functions, or [when] essentially functioning as a police officer or

9    detective."  *Id*. at 1191, quoting *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

10    The *Swift* decision*, however, confirms that absolute immunity extends to parole officials for

11    "tasks integrally related" to the decision to grant or revoke parole."  384 F.3d at 1189.  Here,

12    Parsons and Goldstein's risk-assessment was integrally related to the parole decision: they

13    conducted a clinical interview, analyzed Gay's psychological state, and assessed Gay's future risk

14    for violence for the board's reliance when considering Gay's suitability for parole.  (ECF No. 1-2

15    [September 2015 Comprehensive Risk Assessment].)  Thus, this psychological assessment was

16    not a mere investigative fact-gathering process similar to that of a police officer, it was an integral

17    part of the parole process.  *Antoine*, 508 U.S. at 436 (distinguishing actions that involve the

18    "exercise [of] a discretionary judgment" as a part of their function).

19    Immunity applies because the assessment was prepared at the request of the Parole

20    Hearings Board and integrally relates to any decision "to grant, deny, or revoke parole."  *Swift*,

21    384 F.3d at 1189 (holding that quasi-judicial immunity applies in connection with parole board

22    officials' decisions "'to grant, deny, or revoke parole' because these tasks are 'functionally

23    comparable' to tasks performed by judges"); *Rawlins v. Olson*, 1994 WL 143067 (9th Cir. 1994)

24    (extending immunity to probation officer who prepared presentence report and recommended a

25    higher sentence); *see also Rosser v. Shaffer*, 2017 WL 1064670, *6-7 (E.D. Cal. March 20, 2017)

26    (holding that immunity applied because a psychologist's risk assessments submitted for parole

27    board hearing was integrally related to the parole decision).

28

1    Immunity exists to ensure that parole board members can function as impartial fact finders

2    in each case before them.  *Sellars v. Procunier*, 641 F.2d 1295, 1303 (9th Cir. 1981).  If parole

3    board officials had to anticipate federal litigation each time they rejected a prisoner's application

4    for parole, "their already difficult task of balancing the risk involved in releasing a prisoner

5    whose rehabilitation is uncertain against the public's right to safety would become almost

6    impossible."  *Id.* at 1303.  The same principle applies to Board of Parole psychologists Parsons

7    and Goldstein.  *Id.*; *see also Rosser*, 2017 WL 1064670 at *6-7.  The psychological assessment of

8    an inmate for parole is an integral part of the process for assessing whether an inmate should be

9    paroled.  Thus, Defendants are immune from damages.

10                                    **CONCLUSION**

11    For the foregoing reasons, Defendants' motion for summary judgment should be granted.

12

13    Dated:  February 8, 2021                         Respectfully Submitted,

14                                                     XAVIER BECERRA
                                                       Attorney General of California
15                                                     JAY M. GOLDMAN
                                                       Supervising Deputy Attorney General
16

17

18                                                     */s/ Michael J. Quinn*
                                                       MICHAEL J. QUINN
19                                                     Deputy Attorney General
                                                       *Attorneys for Defendants Parsons and*
20                                                     *Goldstein*

21    SF2017203975
      42546586.docx
22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name:  **Gay v. Shaffer**                    No.  **16-cv-5998-CRB**

I hereby certify that on <u>February 8, 2021</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1) **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2) **DEFENDANTS' WEBER, DE LA TORRE, MARTINUS, AND GONZALEZ'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

3) **DECLARATION OF G. GOLDSTEIN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

4) **DECLARATION OF J. SHAFFER IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, EXHIBITS A AND B**

5) **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>February 8, 2021</u>, at San Francisco, California.


R. Caoile
Declarant

**/s/ R. Caoile**
Signature

SF2017203975
42547423.docx