United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR SHARRIEFF GAY,<br><br>Plaintiff,<br><br>v.<br><br>AMY PARSONS, et al.,<br><br>Defendants. | Case No. 16-cv-05998-JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE DEFENDANTS' EXPERT DR. CRAIG LAREAU**<br><br>Re: Dkt. No. 185 |

## I.    INTRODUCTION

Defendants have proffered Dr. Craig Lareau as an expert in this case.  Presently before the Court is Plaintiff's Motion to Exclude Defendants' Expert Dr. Craig Lareau ("Motion").  A hearing on the Motion was held on June 10, 2026.  For the reasons set forth below, the Motion is GRANTED in part and DENIED in part.[1]

## II.    BACKGROUND

Plaintiff filed the complaint in this case on October 17, 2016, when he was a prisoner at California State Prison, Solano (CSP – SOL).[2]  He brought the case under 42 U.S.C. § 1983 alleging that in September 2015, while he was incarcerated at the Correctional Training Facility in Soledad, Board of Parole Hearings ("BPH") psychologists Amy Parsons and Gregory S. Goldstein interviewed him for a psychological diagnostic evaluation in preparation for a subsequent parole suitability hearing and on account of his being African-American and Muslim, assessed him as high risk for future violence in their 2015 Comprehensive Risk Assessment ("2015 CRA Report"

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).
[2] Gay was paroled in 2022.  *See* dkt. no. 134-2 (Gay Decl.) ¶ 4.

United States District Court
Northern District of California

or "Report").

The Court summarized the 2015 CRA Report in its May 4, 2018 summary judgment order ("May 4, 2018 Order") as follows:

> The September 2015 risk assessment report prepared by Defendant Goldstein and reviewed by Defendant Parsons before plaintiff's subsequent parole suitability hearing included a section entitled "Assessment of Risk for Violence." Compl. Ex. B (ECF No. 1-2) at 11. In that portion of the report, defendants wrote that "Mr. Gay presents with several factors in the historical domain which have been associated with future risk for violence." Id. They noted that plaintiff had a history of violent crime and other antisocial behavior that began at a young age, and increased in severity until he was convicted in 1989 of the attempted murder of a police officer. According to defendants, "Mr. Gay's history of violence and other antisocial behavior are highly relevant risk factors for future violence." *Id*. at 11-12. Plaintiff's antisocial behavior included the following:
>
> Substance Abuse: The report notes that the records indicate that plaintiff's substance abuse history involved the use of alcohol, marijuana and PCP. Plaintiff also was engaged in the selling narcotics and "associated violence related to that lifestyle." Id. at 12. As a result, "Mr. Gay's history of substance use and his involvement in selling narcotics is a relevant factor in his risk for future violence." *Id.*
>
> Negative Relationships and Violent Attitude: During his interview with defendants, plaintiff "noted that his father was involved in organized crime and acknowledged that his father extorted money from businesses in their area." Id. He also explained that his father "instilled early in him that he should not accept the police's authority, the government, or the rule of law." Id. At a young age, plaintiff sought out negative peers, became a gang member, pursued a criminal lifestyle and engaged in ongoing violence. Plaintiff also made a targeted attack on a police officer with the intent to commit murder. As a result, defendants concluded that plaintiff's "history of negative relationships and violent attitude, each present as highly significant factors in his risk for future violence." Id.
>
> History of Employment Problems: The report also noted that plaintiff did not have a consistent work history as an adult in the community. Plaintiff "chose to forgo legitimate employment and instead engaged in gang warfare and criminal behavior for financial gain." Id.
>
> And during his incarceration, plaintiff's work history had not been especially strong. In 2013, plaintiff received "Counseling Chronos" for "failure to report to work and not performing his assigned task," and in 2012, he was written up by correctional staff who suspected he was faking an injury in order to avoid his work assignment. Id. According to defendants, plaintiff's "choice to forgo legitimate employment for criminal behavior and his history of employment problems while in prison present as highly relevant risk factors for

United States District Court
Northern District of California

future violence." *Id*.

Defendants' report also recounted that plaintiff, who attributed his behavior as a young adult to his father's teachings, was now a devout Muslim, "and has accepted Islamic law as his moral compass, guiding his beliefs and actions." *Id*. at 14. But according to defendants, plaintiff did not "appear to have insight as to why he wholly embraced his father's value system, Islamic law, or any other system he chooses to embrace in the future." *Id*. They added that plaintiff's "total commitment to whatever cause he sees fit in the future, and his lack of insight as to why he totally commits himself to that cause as he did on the day he committed the life crime, is a highly significant factor in Mr. Gay's future risk for violence." *Id*.

In the final section of the report, defendants concluded that "based upon an analysis of the presence and relevance of empirically supported risk factors, case formulation of risk, and consideration of the inmate's anticipated risk management needs if granted parole supervision (i.e., intervention, monitoring), Mr. Gay represents a ***High*** risk for violence." Id. at 16 (emphasis in original). They noted that plaintiff had not programmed well during his incarceration and added the following observation:

> Overall, Mr. Gay has not spent a great deal of time while incarcerated attending self-help programming and his level of understanding of his antisocial personality characteristics which predispose him to violence is lacking. Furthermore, Mr. Gay's continued oppositional attitude toward authority does not appear to be well contained and continues to be a highly relevant factor in his risk for future violence at this time. Lastly, Mr. Gay has not communicated an understanding of his total commitment to a particular belief system such as that of his father, his Islamic faith, or any other system he may adopt in the future. And this lack of understanding makes his susceptibility to possible negative influences unpredictable.

*Id*.

May 4, 2018 Order at 2-3 (emphasis in original).

In the May 4, 2018 Order, the Court found that "[u]nder the facts presented in the September 2015 risk assessment report, no reasonable jury could find that defendants' decision that plaintiff posed a high risk for violence was motivated by plaintiff's status as an African-American Muslim. *Id*. at 6 (citation omitted). On the other hand, based on Plaintiff's allegations relating to the interview that led to the issuance of the 2015 CRA, the Court found that a reasonable jury *could* "find by a preponderance of the evidence that defendants' decision that he posed a high risk for violence was motivated at least in part by his status as an African-American Muslim." *Id*. at 7. The Court summarized Plaintiff's allegations relating to the interview as

3

follows:

> In his sworn and verified complaint, plaintiff alleges that during the psychological diagnostic evaluation with defendants he "explained in detail his earliest childhood benefits, introduction, and positive experiences and beliefs from his father's Black Nationalistic and Pseudo Islamic belief system." Compl. ¶ 16.

> > Plaintiff actually elaborated to Defendants, when asked, how Plaintiff's father was a member of a pro-Black Nationalist organization having Pseudo-Islamic beliefs and practiced the social and economic upliftment [sic] of African Americans through 'Black free enterprise, the establishment of Black-owned, Black-operated businesses in the African American communities to the full exclusion of the Jewish business monopoly in the African American communities at that time in the nineteen fifties and nineteen sixties.

> *Id*. ¶ 80. But defendants responded angrily to his description of his community members by referring to them as a "bunch of gorillas and thugs in suits and bow ties." *Id*. ¶ 81. And in their risk assessment report, they stated that plaintiff had "noted that his father was involved in organized crime, and acknowledged that his father extorted money from businesses in their area. Mr. Gay also explained that his father instilled early in him that he should not accept the police's authority, the government, or the rule of law." *Id*. Ex. B at 2. Plaintiff refutes this by alleging that "at no time did Plaintiff report or acknowledge to said Defendants that Plaintiff's father 'was involved in organized crime and extortion.'" *Id*. ¶ 82. Defendants "prejudicially changed lawful economic 'free enterprise' by Black people into 'organized crime' and 'extortion' and 'Black Muslims' into being 'organized criminals.'" *Id*. ¶ 83.

> > Plaintiff further alleges that defendants asked him "racially charged anti-Islamic" questions and called him "racially charged anti-Islamic" names. *Id*. ¶ 17. At one point during the evaluation, Defendant Parsons looked directly at plaintiff and said, "'talk about radical Black Islamic terrorist.'" *Id*. ¶¶ 20, 21. At another point during the evaluation, Defendant Goldstein said, "'with everything going on in the world, at home with Moslems, we don't know if you are just another radical Islamic terrorist." Id. ¶ 14. Goldstein added, "'Parsons and I are just trying to understand in your own words a little about your history as a Moslem, who are you today? What particular ideology do you follow? Malcolm X? Luis Farrakhan? Osama Bin Laden? Who are you today?'" *Id*. ¶ 15. And when plaintiff noted that he had "self-esteem not conceit" in response to a question about whether he thought highly of himself, *id*. ¶ 23, Goldstein asked, "'is that the sort of teachings you learned from those criminals and Black Nationals growing up as a child?" *id*. ¶ 24. Plaintiff objected to the characterization of Black Nationalists as criminals, but Goldstein continued, "'I bet they taught you a lot of that militant garbage and nonsense like Black Power, Black Pride, smashing up Jewish liquor stores, huh?" *Id*. ¶ 27.

United States District Court
Northern District of California

4

United States District Court
Northern District of California

*Id.* at 5-7.  The Court therefore denied Defendants' request for summary judgment on Plaintiff's equal protection claim, which is the only claim that remains in the case.  *Id.* at 9 (granting summary judgment on retaliation claim but denying summary judgment on the equal protection claim and qualified immunity on that claim);  *see also* May 5, 2025 Order Regarding Defendants' Motion for Summary Judgment, dkt. no. 138 (granting summary judgment in favor of Defendants on Plaintiff's claims for injunctive and declaratory relief and denying summary judgment as to equal protection claim for damages).

On March 19, 2024, Defendants disclosed Dr. Craig Lareau as their expert witness and submitted his expert report. Dkt. no. 133-1 (Farley Decl.) ¶ 2 & Ex. 1 ("Report"). According to his CV, Dr. Lareau is a Senior Psychologist-Supervisor at the California Board of Parole Hearings, Forensic Assessment Division.  *Id.* at CV, p. 2.  Dr. Lareau provides two opinions: (1) "In a review of the CRA at issue, there is no evidence of racial discrimination or religious discrimination" (the "First Opinion"); and (2) "[u]pon review of the information that was available to Dr. Goldstein at the time of the 2015 CRA,  . . . Dr. Goldstein's overall conclusion of high risk was reasonable" (the "Second Opinion"). *Id.*, Ex. 1 (Report) at p. 2.

Dr. Lareau explained that he offered the Second Opinion because while there was "no overt  racial and/or religious discrimination" in the 2015 CRA Report, "it is not possible to know whether any person holds beliefs about others that are not overtly shared."  *Id.*  at 4.  As to Plaintiff's allegations that Defendants made discriminatory statements to him during the interview, reflecting racial and religious animus, Dr. Lareau opined that it was "more likely that Mr. Gay may not have been accurate in his description of events[,]" given that Dr. Goldstein's supervisor (co-defendant Amy Parsons) was also participating in the interview and Dr. Goldstein "would have been disciplined for such conduct."  *Id.*

As to the Second Opinion, Dr. Lareau relied on an "extensive review" of the 2015 CRA Report to determine whether its conclusion that Plaintiff was "high risk" was reasonable.  *Id.*  at 7-8.  Dr. Lareau did not have access to the interview notes; rather, "the source of information about what was said in the interview [was] the text of the CRA itself."  *Id.* Dr. Lareau opines further:

Fortunately, this particular CRA was supervised in person by Dr. Goldstein's supervisor, Dr. Parsons, and was reviewed no more than 20 days after the interview; this serves as a source of corroboration for the content of the interview, as Dr. Parsons had the responsibility of addressing any misinformation she would have recalled from the recent interview.

*Id.* at 8.

In the Motion, Plaintiff asks the Court to exclude Dr. Lareau's testimony and opinions on the basis that they are inadmissible. He makes four primary arguments.  First, he contends Dr. Lareau's opinions improperly invade the role of the jury and will not assist the trier of fact because:  1) as to the First Opinion, "the jury is as well-equipped as Dr. Lareau to identify direct discrimination and indirect discrimination" and "[a]n average juror can review the text of the 2015 CRA and determine whether it contains statements linking race or religion to violence[;]" and 2) as to the Second Opinion, Dr. Lareau "merely repeats the factual assertions made in the CRA and concludes that it was reasonable to find Mr. Gay a high risk[,]" a determination that is "well within the jury's competence."  Motion at 1, 4-5. As to both opinions, Plaintiff contends Dr. Lareau offers no specialized knowledge or expert insight.  *Id.*

Second, Plaintiff argues that the First Opinion should be excluded because Dr. Lareau is not an expert on discrimination.  *Id.* at 5-6.  According to Plaintiff, Dr. Lareau admitted in his deposition that he has "no specialized knowledge pertaining to discrimination."  *Id.*   In particular, Plaintiff points to deposition testimony offered by Dr. Lareau that "he has never been retained as an expert in a racial or religious discrimination case," *id.* at 6 (citing Lareau Dep. at 18:10-12); that he "took law courses on discrimination and taught post doc fellows about bias but 'wouldn't call it necessarily . . . training in racial discrimination[,]'" *id.* (citing Lareau Dep. at  27:9-21) and that "[w]hile his professional responsibilities include supervising Comprehensive Risk Assessments (CRAs) for clinical soundness, he is not trained or experienced in identifying discrimination."  *Id.* (citing Lareau Dep. 18:1-12; 27:9-21).[3]

---

[3] The deposition excerpts cited by Plaintiff are attached as Exhibit 2 to the Declaration of Alexandra S. Farley in Support of Plaintiff's Motion to Exclude Defendants' Expert Dr. Craig Lareau and Strike Dr. Craig Lareau's Declaration, dkt. no. 133 ("Farley Decl.").  In addition, two pages that are missing from the excerpts attached to the Farley Declaration are attached to a supplemental declaration filed after the motion hearing.  *See* dkt. no. 194 (Supplemental Declaration of Elizabeth Snow in Support of Plaintiff's Motion to Exclude Dr.

United States District Court
Northern District of California

United States District Court
Northern District of California

Third, Plaintiff argues that Dr. Lareau's methodology is not sound for either opinion. *Id.* at 6-8. With respect to the First Opinion, Plaintiff points to Dr. Lareau's testimony that he reviewed the 2015 CRA for evidence of "direct" and "indirect discrimination" but according to Plaintiff, his methodology as to both was unsound. *Id.* at 6. In particular, as to direct discrimination, Dr. Lareau testified that he "scann[ed] the Report for any explicit statement linking Mr. Gay's race or religion to the potential for violence" but Dr. Lareau "fail[ed] to even identify which specific words he was looking for in his read of the Report that would have qualified as evidence of direct discrimination." *Id.* (citing Lareau Dep. at 63:19-64:9). Dr. Lareau's methodology was "even less rigorous" as to indirect discrimination, Plaintiff asserts, applying a "you-know-it-when-you see-it" approach that he likened to identification of obscenity. *Id.* (citing Lareau Dep. at 27:9-21, 64:10-13). Plaintiff contends "[t]his subjective standard—untethered to any recognized principles, testing criteria, or replicable process—is precisely the kind of ipse dixit reasoning that Daubert prohibits." *Id.* (citing *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014); *Pecover v. Elec. Arts Inc.*, No. C 08-2820 VRW, 2010 WL 8742757, at *7 (N.D. Cal. Dec. 21, 2010)).

Similarly, Plaintiff contends Dr. Lareau's methodology falls short as to the Second Opinion because "[r]ather than evaluating whether Dr. Goldstein followed appropriate procedures in preparing the CRA, Dr. Lareau focused solely on whether the conclusions seemed reasonable." *Id.* at 7. To assess the reasonableness of Dr. Goldstein's conclusions in the CRA, Plaintiff contends, Dr. Lareau should have followed the procedures set forth in the California Parole Hearing Process Handbook ("Handbook"), which "specifies that an individual preparing a CRA should review a prisoner's 'prison record and criminal history,' as well as interview the prisoner if possible." *Id.* (citing Handbook, available at https://www.cdcr.ca.gov/bph/wpcontent/ uploads/sites/161/2025/03/CA-Parole-Hearing-Process-Handbook-For-Publication-03-08-24-2.pdf, § 2.15). Plaintiff points out that Dr. Lareau did not interview Plaintiff and asserts that Dr. Lareau "admitted that his conclusions assumed 'the factual information in Doctor

---

Craig Lareau) ("Snow Supp. Decl.").

Goldstein's report was accurate.' which he admitted was a 'major caveat' to his conclusions." *Id.* (citing Lareau Dep. at 34:25-35:2, Snow Supp. Decl., Ex. A).

Fourth, Plaintiff contends Dr. Lareau improperly attacks Plaintiff's character, motive and credibility in his report. *Id.* at 8 (citing Lareau Report at 4). In particular, Dr. Lareau states in his report:

> It is acknowledged that there is a dispute about the content of the questions asked in the interview. Drs. Goldstein and Parsons assert that no inappropriate questions were asked of Mr. Gay. Mr. Gay has asserted in his complaint that the interview was rife with discriminatory animus and content. Although it is possible that Dr. Goldstein could have risked his career to personally attack Mr. Gay with overt racial and religious discrimination during the interview (as he would have been disciplined for such conduct, especially with his supervisor in the room), it may be more likely that Mr. Gay may have not been accurate in his description of events.

Farley Decl., Ex. 1 (Lareau Report) at p. 4. Plaintiff asserts that it is "well-established that an expert may not opine on a witness's credibility." Motion at 8 (citing *Est. of Casillas v. City of Fresno*, No. 1:16-CV-1042 AWI-SAB, 2019 WL 586747, at *7 (E.D. Cal. Feb. 13, 2019)). Because Dr. Lareau's opinions concerning Plaintiff's credibility have the potential to mislead the jury, Plaintiff asserts, those opinions should be excluded. *Id.* at 9.

## III.    ANALYSIS

### A.    Legal Standards Under Rule 702 and *Daubert*

Under Rule 702 of the Federal Rules of Evidence, "before admitting expert testimony, 'the district court must perform a "gatekeeping role" [to] ensur[e] that the testimony is both "relevant" and "reliable." ' " *United States v. Valencia-Lopez*, 971 F.3d 891, 897–98 (9th Cir. 2020) (quoting *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993))). "This gatekeeping obligation 'applies to all (not just scientific) expert testimony.'" *Id.* (quoting *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

Rule 702 provides that a witness may offer expert testimony if the following requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court "discussed several reliability factors, including testing, peer review and publication, known or potential rate of error, and general acceptance in the relevant scientific community." *Valencia-Lopez*, 971 F.3d at 898 (citing *Daubert*, 509 U.S. at 592–94). The reliability inquiry is flexible, however, and gives the district court " 'broad latitude to determine' what factors in *Daubert*, if any, are relevant to the reliability determination." *Id.* (quoting *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc) (quoting *Kumho Tire*, 526 U.S. at 150)). But this broad latitude does not permit the court to "abdicate completely its responsibility" to ensure that expert testimony is reliable. *Id.* (quoting *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002), overruled on other grounds by *Barabin*, 740 F.3d 457). The Ninth Circuit has recognized that where the reliability of an expert's opinions is based on experience rather than science, the reliability determination under *Daubert* "may be harder to apply[,]" but "any such difficulty cannot simply lead to a 'that goes to weight, not admissibility' default[.]"

## B.   Admissibility of First Opinion

The Court finds that Dr. Lareau's First Opinion – that there is no evidence of discrimination in the 2015 CRA Report-- is inadmissible under Rule 702 and *Daubert* for several reasons.

First and foremost, the question of whether the 2015 CRA Report contains content that is directly or indirectly discriminatory is well within the understanding of the jury. *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir. 1980), ("the question whether gender was the basis of differential treatment is not so technical as to require the aid of an expert to enlighten the jury or court."), *disapproved on other grounds*, *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981)); *see also C.N. v. Wolf*, No. SACV 05-868 JVS(MLG), 2006 WL 5105270, at *1

9

United States District Court
Northern District of California

(C.D. Cal. Nov. 13, 2006) ("The Court agrees with the propositions that no expert testimony is neede[d] when the subject matter is within the common knowledge of the fact finder, *United States v. Christophe*, 833 F.2d 1297, 1299 (9th Cir.1987), and that experts are generally not allowed to testify as to whether particular conduct is discriminatory."). Defendants' attempt to distinguish these cases on the basis that "Dr. Lareau is opining about the content of the report prepared by Defendants, not the conduct of Plaintiff or Defendants[,]" Opposition at 2, is unavailing because the 2015 CRA Report finding Plaintiff to be high-risk is, indeed, the discriminatory conduct by Defendants upon which Plaintiff's equal protection claim is based.

Furthermore, Dr. Lareau does not dispute that he is not an expert on the subject of discrimination. And while Defendants point to Dr. Lareau's "expertise with regard to preparing risk assessments for inmates eligible for parole," Opposition at 1-3, they do not explain how this experience translates into expertise that will help the jury to understand the facts relevant to whether the 2015 CRA Report is discriminatory that are beyond the understanding of the average lay person. *See Strandquist v. Washington State Dep't of Soc. & Health Servs*., No. 3:23-CV-05071-TMC, 2024 WL 4625337, at *6 (W.D. Wash. Oct. 30, 2024), reconsideration denied, No. 3:23-CV-05071-TMC, 2024 WL 4979859 (W.D. Wash. Dec. 4, 2024) (finding that expert testimony did not satisfy *Daubert* where proponent did not "show a methodological nexus between [proffered expert's] experiences and conclusions"). Similarly, although Defendants assert that Dr. Lareau's "analysis went far beyond Plaintiff's claimed 'you know it when you see it methodology[,]'" that is exactly the methodology that Dr. Lareau described in his deposition with respect to whether the 2015 CRA Report was discriminatory. *See* Farley Decl., Ex. 2 (Lareau Dep.) at 27: 18-21. Consequently, the Court finds that the First Opinion is inadmissible.

### C.    Admissibility of Second Opinion

Defendants offer the Second Opinion – that the conclusions of the 2015 CRA Report were reasonable – to counter Plaintiff's allegation that the high-risk finding was motivated by discriminatory animus. The Court finds that this opinion is admissible under Rule 702 and *Daubert*.

Plaintiff argues that in order to provide any reliable or useful expert opinions as to the

reasonableness of the conclusions reached in the 2015 CRA Report, Dr. Lareau would have needed to have conducted his own independent review of the records that are required to be reviewed, as set forth in the Handbook, in order to complete a CRA assessment. He further cites deposition testimony he contends establishes that Dr. Lareau did not do so.  In particular, he points to Dr. Lareau's testimony that he "assumed that *everything* written in the CRA by Goldstein in 2015 was accurate." *See* Snow Supp. Decl., Ex. A (Lareau Dep.) at 35: 11-14 (emphasis added).

The Court has reviewed the cited deposition testimony, however, and concludes that Dr. Lareau testified that he reviewed the same underlying evidence as Dr. Goldstein did. *See id*. at 34-35. In particular, Dr. Lareau stated: "I also reviewed the information that was available to Doctor Goldstein at the time he completed his report in 2015. And using that information performed my own assessment  . . . [to determine if I] would . . . have . . . if performing the evaluation with similar information come to a similar conclusion." *Id.*  While it is true that Dr. Lareau also testified that he assumed the underlying information available to Dr. Goldstein was "accurate," Plaintiff has not pointed to anything in the Handbook that suggests that Dr. Goldstein – and by extension, Dr. Lareau – acted improperly in assuming that the prison records they both reviewed to perform the evaluation were accurate.  There also is no dispute that Dr. Lareau assumed that the Report contained an accurate description of what occurred during the interview and did not conduct his own interview of Plaintiff.  However, so long as the jury is properly instructed that Dr. Lareau's opinions are based on that assumption – and that the jury must decide what actually occurred in the interview—the Court finds that Dr. Lareau's opinions are sufficiently reliable to meet the requirements of *Daubert*  and Rule 702.

### D.    Credibility Opinions

 "An expert witness is not permitted to testify specifically to a witness' credibility or to testify in such a manner as to improperly buttress a witness' credibility." *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989).  Dr. Lareau's opinion that Plaintiff "may have not been accurate in his description of" what occurred during his interview with Dr. Goldstein and Ms. Parsons falls squarely under that rule, no matter whether he states outright that Plaintiff lied or phrases his opinion less directly. Moreover, to the extent that the presence of Dr. Goldstein's

11

United States District Court
Northern District of California

supervisor (Ms. Parsons) in the interview may cast doubt on Plaintiff's version of what occurred, no expert testimony is required for the jury to understand that issue. Therefore, the Court finds that Dr. Lareau's credibility opinions are improper and inadmissible.

## IV. CONCLUSION

For the reasons stated above, the Motion is GRANTED in part and DENIED in part. Dr. Lareau is precluded from offering the First Opinion at trial or offering the credibility opinions discussed above. He may offer the Second Opinion so long as the jury is properly instructed as to the assumption upon which that opinion is based.

**IT IS SO ORDERED.**

Dated: June 23, 2026

_____
JOSEPH C. SPERO
United States Magistrate Judge

12